IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 25, 2016

**DAVID ALAN HUNTER v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Hamilton County**
**No. 284870   Don W. Poole, Judge**

_____

**No. E2015-02177-CCA-R3-PC – Filed December 1, 2016**

_____

The petitioner, David Alan Hunter, appeals from the post-conviction court's denial of relief from his conviction for first-degree murder and attempted especially aggravated robbery. On appeal, the petitioner argues he received ineffective assistance of counsel due to trial counsel's failure to adequately explain the benefits of accepting a plea agreement despite his assertion of innocence and failure to convey a formal plea offer made by the State. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT L. HOLLOWAY, JR., JJ., joined.

Lorrie Miller, Chattanooga, Tennessee, for the appellant, David A. Hunter.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Neal Pinkston, District Attorney General; and Cameron Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

The petitioner was convicted by a Hamilton County Criminal Court jury of first degree murder and attempted especially aggravated robbery, for which he received an effective sentence of life imprisonment. This Court affirmed his convictions on direct appeal, and our Supreme Court denied his application for permission to appeal. *State v.*

*David A. Hunter*, E2010-01351-CCA-R3-CD, 2011 WL 1532086, at \*1 (Tenn. Crim. App. April 20, 2011). On direct appeal, this Court recited the following underlying facts and procedural history:

On March 16, 2008, James Fleming, Jr., a cab driver for Mercury Cab Company, was shot in the head during a failed robbery attempt in the St. Elmo area of Chattanooga. He died instantly. Two days later, Chattanooga Police Department (CPD) Detective Justin Kilgore arrested the [then] fifteen-year-old [petitioner] for Mr. Fleming's murder. Although the [petitioner] confessed to shooting the victim, at trial he testified that another individual, Dewayne Johnson, had committed the murder. The jury convicted the [petitioner], as indicted, of the first degree felony murder and attempted especially aggravated robbery of the victim.

Steve Troxler, a longtime resident of St. Elmo, was at home with his family on the evening of March 16, 2008, when, at approximately 9:10, he heard a gunshot followed by a crash. He went outside to investigate the source of the noise and discovered that the victim's cab had crashed into a nearby garage. When he looked inside the cab, Mr. Troxler discovered that the victim had suffered a gunshot wound to the left side of his head. Mr. Troxler was about to check the victim's pulse when his wife, a nurse, told him not to because it was "too late." He and other neighbors then waited on the police, who soon arrived. Mr. Troxler did not see anyone running from the victim's cab, but he did recall that there was a wooded area adjoining a cemetery nearby.

Christine Edwards, the victim's niece, regularly rode with the victim in his cab and was doing so on the night of March 16, 2008. She admitted that they had smoked marijuana together earlier in the evening. She rode with the victim to pick up a "fare" in the Alton Park area of Chattanooga. She recalled that the individual entered the back seat of the cab from the driver's side and that he was a young African American male dressed in black clothing and wearing a "black doo rag" on his head. Ms. Edwards later identified the individual as the [petitioner].

Ms. Edwards testified that the [petitioner] directed the victim to the [petitioner's] destination, a green house in the St. Elmo area. As the cab approached the residence, the victim turned on the interior dome light of the cab. The [petitioner] then placed a gun to Ms. Edwards' head and told her to "give [him] all [her] shit." When Ms. Edwards reached for her purse, the [petitioner] directed her to keep her hands up and then moved the gun to

- 2 -

the victim's head.  Ms. Edwards described an "ugly confrontation" between the [petitioner] and the victim during which she was ordered out of the cab. As she sat on the curb watching, the victim and the [petitioner] were "tussling" and "wrestling with the steering wheel of the cab."  Finally able to put the cab in drive, the victim drove the cab forward, skirting a dumpster before crashing into a shed just as Ms. Edwards heard two gunshots.

After the cab crashed, Ms. Edwards "got up and ran" several houses away from the crash site.  She saw the [petitioner] walking toward her, and she entered a home through an unlocked front door.  When the homeowner met her in the hallway, Ms. Edwards reported that her uncle had been robbed.  The homeowner telephoned the police who arrived "within like a minute."

The police informed Ms. Edwards that her uncle had died.  After providing a statement to Detective Kilgore, Ms. Edwards reviewed several photographic lineups but was unable to make any identification of the assailant.  She initially described the assailant as approximately 5'8" in height and weighing 145 to 150 pounds.  The [petitioner], however, weighed over 200 pounds and was taller than 5'8".  Ms. Edwards first identified the [petitioner] six weeks later upon seeing him at the juvenile court transfer hearing.  Despite the discrepancies between her description of the assailant and the [petitioner's] actual physical characteristics, Ms. Edwards stated, "I recognized him [at the transfer hearing].  I couldn't believe that it was him, but they found him, that was him.  The same guy I described, it was him."

Elizabeth Marlar Capecchi lived in the St. Elmo area of Chattanooga on March 16, 2008.  As she was putting her youngest son to bed that evening, she heard knocking at her front door and walked to her foyer to find Ms. Edwards in her home.  She recalled that Ms. Edwards was "just kind of yelling and screaming and sort of crying."  Ms. Edwards told Ms. Capecchi that "[s]omeone tried to mug us" and "he's behind me."  Ms. Capecchi looked out the side transom windows of her door to see someone walking up the hill toward Forest Hills Cemetery.  She described the individual as a "kind of hefty, stocky black guy," wearing dark clothing and weighing about 220 pounds.  She could not, however, see the individual's face.

- 3 -

Doctor James Kenneth Metcalf, Hamilton County Medical Examiner, performed an autopsy of the victim and determined that the victim died from a single gunshot wound to his head which entered above and behind his left ear. The bullet pierced the skull on both sides and came to rest just beneath the skin near the victim's right ear. Doctor Metcalf opined that the victim's death was instantaneous.

Doctor Metcalf removed the bullet and provided it to CPD Detective Chad Rowe who forwarded it to the Tennessee Bureau of Investigation (TBI) Crime Lab for analysis. The parties stipulated that TBI Special Agent Steve Scott identified the bullet as a .38 caliber automatic. Special Agent Scott could not, however, match the bullet to any handgun due to insufficient markings.

Former CPD Officer Brian Lockhart worked for the CPD crime scene unit in March 2008. He swabbed the victim's cab for blood and other DNA evidence. He also processed the vehicle for latent fingerprints and gunshot residue evidence.

TBI Special Agent James Russell Davis, II, performed microanalysis on items collected by Officer Lockhart. Testing revealed the presence of gunshot residue on the driver's side headrest of the cab. No gunshot residue was discovered on any clothing submitted for testing. Special Agent Davis could not, however, determine the owner of the clothing that was submitted for testing.

TBI Special Agent Jennifer Shipman performed serology testing on samples collected by Officer Lockhart. Of the non-degraded samples submitted, none matched the [petitioner] or Dewayne Johnson. Of the blood samples submitted for testing, all matched the DNA of the victim.

TBI Special Agent Dabney Kirk performed fingerprint analysis of the latent fingerprints collected by Officer Lockhart. Of the seven prints submitted, only three were identifiable. None matched Dewayne Johnson or the victim. One of the three prints matched the [petitioner]. Special Agent Kirk acknowledged that there was no way to ascertain when the print was left on the cab.

Detective Justin Kilgore used telephone logs from the cab company to determine the telephone number of the last fare picked up by the victim. Through the assistance of the cellular telephone carrier associated with the

telephone number, Detective Kilgore ultimately determined that the cellular telephone was owned by Leslie Bailey, the [petitioner's] mother. Further assistance from the cellular telephone company enabled Detective Kilgore to determine the precise location of the cellular telephone, leading to the apprehension of the [petitioner] on March 18, 2008.

Detective Kilgore transported the [petitioner] to the CPD service center where he placed the [petitioner] in an interrogation room. Knowing that the [petitioner] was a juvenile, Detective Kilgore contacted the [petitioner's] mother who arrived at the service center at approximately 9:30 p.m. Detective Kilgore did not question the [petitioner] while awaiting Ms. Bailey's arrival. After a full explanation of his *Miranda* rights, the [petitioner] initialed each right as an indication of his understanding and signed a waiver of his rights. Detective Kilgore, the [petitioner's] mother, and another officer witnessed the execution of the waiver.

After being confronted with evidence concerning the telephone logs, the [petitioner] admitted that, after spending March 16 with friends, he went to "The Villages" where he telephoned the cab company. He used "*67" to block his cellular telephone number from showing on the cab company telephone's caller identification. When the cab arrived, he entered the back seat through the driver's side and directed the cab driver to take him to 44th Street in the St. Elmo area. The [petitioner] told Detective Kilgore that there was a female passenger in the front seat with the driver. When the cab stopped, the [petitioner] pulled a gun from his pocket and held it to both the cab driver and the female passenger's heads. The [petitioner] ordered the female from the vehicle. When the [petitioner] demanded money from the cab driver, the cab driver "[t]ried to drive off." The [petitioner] admitted to Detective Kilgore that the cab driver "kept trying to drive off and I shot him." The [petitioner] said that the cab driver hit another car before crashing into the garage. When the car stopped, the [petitioner] fled the scene and walked back to the home of his best friend, Ronald White. He said that he walked through a wooded area and a cemetery on his way to Mr. White's home.

In his statement to police, the [petitioner] said that he was wearing bright green shorts and a black t-shirt. He reported that the gun was a black .38 caliber automatic that he had found in the grass a "couple of days" earlier on Jackson Street. He claimed that he was walking with Mr. White when he found the gun and that he concealed it in the back waistband of his

pants. He said that after the shooting, he gave the gun to an unknown black male on his way back to Mr. White's house. The [petitioner] told Detective Kilgore that he looked up the telephone number to the cab company before he left Mr. White's house that night. He said that he planned to rob the cab driver before leaving but that he had no intention to kill anyone. The [petitioner] did not obtain any money from his efforts.

Two days after the [petitioner] made his statement, the [petitioner's] mother, Leslie Bailey, telephoned Detective Kilgore to tell him that the [petitioner] had told her that Dewayne Johnson committed the offenses. Detective Kilgore investigated this information and determined, based upon an interview with Mr. Johnson and the absence of any physical evidence linking him to the crimes, that Mr. Johnson had nothing to do with the shooting.

At trial, Detective Kilgore admitted that the telephone records were not "necessarily indicative" of who had placed the call to the cab company. He also acknowledged at trial that the [petitioner's] physical characteristics differed somewhat from the eyewitness descriptions and that the eyewitness descriptions may more accurately describe Mr. Johnson. He reiterated, however, that the [petitioner] possessed the cellular telephone within two days of the offenses and that the [petitioner] confessed to the shooting. Detective Kilgore also noted that the .38 caliber bullet recovered from the victim was compatible for use in a .38 caliber handgun.

At trial, the [petitioner] testified that he was staying with Mr. White during spring break on the weekend of March 16, 2008. He said that he and his friends spent the day visiting friends. He said that they typically walked but sometimes rode the bus or called a cab to get to their destinations. After visiting several friends during the day, the [petitioner] and Mr. White returned to Mr. White's home where they watched a movie. Sometime during the evening while the [petitioner] and his friends were outside, Mr. Johnson approached the [petitioner] with an offer to make some "quick money." The two men then planned the robbery of a cab driver. The petitioner obtained the telephone number to the cab company and telephoned for the cab on his cellular telephone. As the cab approached, the [petitioner] changed his mind and abandoned the plan to assist in the robbery. He gave Mr. Johnson his cellular telephone and asked him to return it to him later that night. The [petitioner] testified that he watched Mr. Johnson enter the vehicle and ride away, waited a few

- 6 -

minutes, and walked to Mr. White's home where he and Mr. White washed dishes and watched another movie.

Sometime after 9:00 p.m., Mr. Johnson called the [petitioner] and returned the cellular telephone to him. In their brief conversation, Mr. Johnson told the [petitioner] the details of the robbery but did not admit any details about the shooting. The [petitioner] testified that he never saw Mr. Johnson again. The victim's murder was reported during the 11 o'clock news later that night. Fearful of being labeled a "snitch," the [petitioner] did not contact the police or say anything to any of his friends concerning his knowledge of the offenses.

The petitioner explained that he confessed to the police because Detective Kilgore offered to help him with the judge and also because he thought nothing would happen to him because of his juvenile status. When he realized that he would be tried as an adult, he decided to disclose that Mr. Johnson had committed the offenses. He denied getting into the cab and having any involvement in the shooting. He claimed knowledge of the details of the offenses based upon the brief, yet detailed, conversation between himself and Mr. Johnson.

Ronald White testified at trial that he and the [petitioner] spent the entire day of March 16 together except for about 10 to 15 minutes in the evening when the [petitioner] went next door to visit a neighbor. Mr. White said that when the [petitioner] returned, they washed dishes together and watched a movie. He said that the [petitioner's] demeanor was normal throughout the day and that he had never seen the [petitioner] with a gun, either on March 16 or any other day. On cross-examination, Mr. White acknowledged that the [petitioner] had told him he went next door to visit the neighbor and that he did not actually see the [petitioner] at the neighbor's house. He also expressed surprise that the [petitioner] had confessed to Detective Kilgore that he went to "The Villages," planned the robbery, and shot the victim.

Marilyn Thompson, Mr. White's mother, testified that the [petitioner] was with her son at her home on the evening of March 16. She said that the boys had spent the day "just hanging out" because it was spring break. She recalled that the [petitioner] went next door to the neighbor's home for a few minutes, but she admitted that she did not actually see him there because she had been asleep during part of the evening. She never saw the [petitioner] with a gun that day or any other

day. Her son and the [petitioner] left her home at approximately 11:30 p.m. to go visit her son's girlfriend. She was "so surprised" when her son told her two days later that the police "got Alan" for the murder of the cab driver.

LaKeisha Boden, Mr. White's girlfriend, testified that the [petitioner] and Mr. White came to her home around midnight on March 16. She said that she had met the [petitioner] several times before and that nothing seemed unusual about his demeanor or behavior that evening. She admitted that she had no knowledge of what the [petitioner] may have been doing earlier that night.

In rebuttal, the State presented the testimony of Dewayne Johnson who testified that he met the [petitioner] once several weeks before the shooting and that they had gotten into a fight. He said that after that incident, he never saw the [petitioner] again. He denied planning a robbery of the cab driver. He said that he spent March 16 working with his school youth conference and returned home at approximately 7:00 p.m., where he remained for the rest of the night. On cross-examination, Mr. Johnson admitted that he had lied to Detective Kilgore when he told him that he had spent the day playing video games with friends that day.

Based upon this evidence, the jury convicted the [petitioner], as charged, of the first degree felony murder and attempted especially aggravated robbery of Mr. Fleming. At sentencing, the trial court imposed a life sentence by operation of law, *see* T.C.A. §§ 39-13-202(c)(3), -208(c), for the first degree felony murder conviction and a concurrent minimum sentence of eight years' incarceration for the attempted especially aggravated robbery conviction, upon the recommendation of the State.

*David A. Hunter*, 2011 WL 1532086, at *1-6 (footnote excluded).

The petitioner subsequently filed a timely pro se petition for post-conviction relief arguing ineffective assistance of counsel, asserting a series of perceived deficits in trial counsel's representation that are not before this Court on appeal. After filing an affidavit of indigency, the post-conviction court appointed counsel for the petitioner, who filed an amended petition for post-conviction relief, arguing the petitioner's trial counsel was ineffective for failing to confer with the petitioner prior to trial, fully conduct appropriate investigations of the State's evidence before proceeding to trial, and acquire appropriate expert witnesses. The petitioner subsequently filed a second amendment to his petition for post-conviction relief, this time arguing trial counsel had a duty to communicate

formal plea offers from the prosecution and failed to do so. According to the petitioner, trial counsel failed to spend adequate time with him prior to trial and failed to fully advise and consort regarding the possible outcomes of trial versus accepting any plea deal offered by the State before proceeding to full trial.

## A.    First Post-Conviction Hearing

The post-conviction court first heard the twice-amended petition for post-conviction relief on September 22, 2014. Trial counsel testified that he was appointed to represent the petitioner at trial. He had been practicing for twenty-two years, approximately eighteen of which he spent doing criminal defense work. During that time period, he had tried approximately 150 civil and criminal matters. Prior to the petitioner's trial, he had participated in approximately fifty criminal trials.

Trial counsel recalled a plea offer of second degree murder with a twenty-year sentence but was uncertain as to the specifics. Trial counsel testified he would have discussed the plea offer and its meaning with his client, including the range of potential outcomes should the petitioner instead chose to proceed to trial. According to trial counsel, "because there was a handprint of his on the taxi window that he was saying it's his position he'd never been near, I felt like second degree was a pretty good option for him." According to trial counsel, the petitioner did not take the plea offer.

When questioned about the petitioner's mother, trial counsel noted the petitioner, who was a minor at the time, was very reliant on his mother. The petitioner would relay their conversations to his mother, and trial counsel would then speak with her. With respect to accepting a plea offer, it was trial counsel's impression the petitioner would follow his mother's instructions, and the petitioner's mother wanted him to go to trial because she believed he would be acquitted. Trial counsel testified that the petitioner was competent and had a clear understanding of the process. According to counsel, the petitioner deferred to his mother due to his feelings for her, not because he was incapable of making a decision.

Trial counsel testified at length about the amount of time spent with the petitioner prior to trial and the documentation of those meetings in his time records. All time entries for in-jail visits with the petitioner include travel and wait times. Trial counsel's time records include these in-jail meetings with the petitioner: approximately seventy-three minutes on August 12, 2008; approximately seventy-eight minutes on November 17, 2008; approximately ninety-six minutes on August 24, 2009; and approximately one-hundred and forty-four minutes on September 3, 2009. Trial counsel typically compares his time records with his calendar prior to submitting them for payment, but due to a

secretarial error, these records were never compared with his calendar, and a bill was not submitted for payment. His time records could, therefore, be incomplete or inaccurate.

Trial counsel testified that it is easier to arrange meetings with juvenile clients at the courthouse than in jail, so he also met with the petitioner at the courthouse prior to hearings and trial. Trial counsel's time records show he met with the defendant for approximately thirty-six minutes prior to court on March 9, 2009, and approximately seventy-five minutes prior to court on June 29, 2009. Trial counsel testified that it is possible additional client meetings took place at the courthouse but were not documented in his time records.

Trial counsel testified that he met with the petitioner enough to advise him of the charges and the proof, discuss potential witnesses, make a decision as to whether to testify, and prepare for cross-examination. Considering the additional time he spent meeting with the petitioner in the courthouse and speaking with his mother, trial counsel stated the time he spent with the petitioner in jail was "absolutely" sufficient.

Trial counsel stated that it is his obligation "[t]o zealously represent [his] client to the best of [his] ability." He is responsible for trial strategy, but it is his client's decision as to whether to testify or plead guilty. With respect to plea agreements versus going to trial, trial counsel testified, "I don't ever take the view that it's a really good idea to talk your clients into pleading, and so if you leave it to your clients, a lot of them would like to see what happens at trial and I end up trying a lot of cases."

By stipulation, the parties entered the jail visitation log into evidence. The log documented the following three visits from trial counsel: twenty-nine minutes on August 12, 2008; forty-seven minutes August 24, 2008; and an hour and thirty-four minutes on September 3, 2009.

The petitioner testified that he was fifteen years old at the time of his arrest and in the ninth grade. He first had contact with trial counsel after being incarcerated a couple of months. During their initial meeting, trial counsel introduced himself, and the petitioner gave him an overview of the case. The meeting lasted about thirty minutes. He later received a copy of discovery by mail, but trial counsel never went over it with him. At some point, trial counsel did review various statements with him, including his confession. Trial counsel then filed a motion to suppress the petitioner's statement, which he understood was meant to prevent the use of his statement at trial.

The petitioner testified that he only saw trial counsel three or four times in jail. The petitioner would request visits in letters or tell his mother to request a visit for him, but his lawyer did not visit until the trial date got close. The petitioner confirmed that

trial counsel would also meet with him prior to court hearings. The conversations would last a few minutes, and trial counsel would explain what would happen during the hearing. The petitioner denied having input as to trial strategy.

A couple weeks prior to trial, the petitioner wrote a letter to the judge complaining that his lawyer was not doing his job. The petitioner testified that he wanted a new lawyer and wrote the letter in an effort to fire trial counsel. Prior to the suppression hearing, the trial court questioned the petitioner regarding the letter and indicated he felt trial counsel was working on the case. The petitioner denied continuing to have a problem with his attorney and apologized to counsel for sending the letter. The petitioner did not think pushing the issue would do any good and did not want his lawyer to be angry during the trial.

According to the petitioner, trial counsel met with him in jail for a second time a couple months prior to trial. During the meeting, the petitioner requested a plea of reckless homicide. Trial counsel came back to see him for a third time about a week prior to trial and said he had spoken to the prosecutor, who laughed and rejected the requested plea. The petitioner testified that trial counsel told him he thought he could get the petitioner a sentence of approximately twenty-five years, to be served at eighty-five percent, in exchange for a plea of second degree murder. The petitioner has never understood whether that was an official plea offer or a proposal. He did not respond at the time because he did not think it was a formal offer. When asked his thoughts on the proposed plea, the petitioner testified:

> I was considering it. I was considering taking the offer, because if he came back to me with the offer, I would have took it. I let my mother know that same night, I think the same or couple days later . . . [a]nd she told me, [w]ell, if you innocent, why would you take something like that. She was saying all this, that what she was saying, but the whole time, I was waiting for [trial counsel] to come back with the deal so I can go and sign the paper. I didn't want to go to trial.

Following the third jail visit, the petitioner did not see trial counsel again until the first day of trial. At that time, the petitioner did not ask about the potential plea. Instead, he "kind of figured it was too late to do anything because this was the start of trial."

According to the petitioner, trial counsel should have met with him more often and had more conversations regarding trial strategy. He was young and did not understand what was happening or how the criminal justice system worked. In his letters to trial counsel, the petitioner repeatedly stated that he did not know what was going on with his

case. When they finally met prior to trial, trial counsel acknowledged receipt of his letters but never gave the petitioner a clear understanding of the case's status.

Leslie Michelle Bailey, the petitioner's mother, testified that her son frequently complained trial counsel did not come to jail enough. She was not the client, so she did not complain to the trial judge about this. According to Ms. Bailey, the petitioner is easily frustrated with people in authority, which is why he confessed to the murder. She did not think the petitioner was intimidated by trial counsel, simply frustrated with his failure to communicate.

Prior to trial, the petitioner contacted her regarding a potential plea of second degree murder with a twenty-five year sentence and asked her opinion regarding accepting the offer. Ms. Bailey testified that she told the petitioner to go to trial and not plead guilty. Ms. Bailey admitted to pressuring her son not to accept the offer. Ms. Bailey admitted she did not know whether the State formally put the plea offer in writing; she never saw a formal written document.

Ms. Bailey and trial counsel had "quite a bit of contact" regarding her son's case. She frequently contacted trial counsel and received one return call for every eight or nine messages. She spoke with him the evening before trial regarding the proposed plea agreement. Trial counsel stated it would be advantageous for her son to take the plea deal because he could not appeal a first degree murder conviction. In response, Ms. Bailey said, "[W]e're just going to let the Lord take control, because we're all a family of faith, so we believe that the Lord will take care of it." According to Ms. Bailey, in response trial counsel said, "[I]f he's convicted for first degree murder, the Lord cannot take care of that."

Ms. Bailey testified that the petitioner, who was in the eighth grade at the time of his arrest, was academically above average and had been nationally recognized for his academic accomplishments. He understood the plea offer, and it was his decision to reject it. Neither she nor her son understood the implications of going to trial.

Marla McGee, the petitioner's grandmother, also testified at the initial hearing on his motion for post-conviction relief. Ms. McGee works with psychologist Dr. David Ross, who does trial consulting work. According to Ms. McGee, Dr. Ross was willing to assist with the petitioner's case, as was Dr. Cresman, a false confession expert recommended by Dr. Ross. Ms. McGee was willing to pay any expenses associated with engaging these experts and provided trial counsel with their contact information. To her knowledge, trial counsel never contacted the recommended experts.

Following the adverse jury verdict, trial counsel filed a timely direct appeal. After this Court affirmed the petitioner's conviction, his family hired Donna Miller to handle the application for permission to appeal to the Tennessee Supreme Court. In addition to the issues raised by trial counsel, Ms. Miller felt certain cell phone records had been improperly obtained by law enforcement. Trial counsel, however, did not preserve that issue for appeal, so Ms. Miller could not raise it in her application.

Ms. Miller had extensive contact with the petitioner and his mother, Ms. Bailey. During the post-conviction hearing, Ms. Miller testified that Ms. Bailey is extremely intelligent, but she is uneducated on the criminal justice process. According to Ms. Miller, when she has clients who are juvenile transfers or particularly reliant on their family members, she tries to spend a lot of time developing a relationship with those family members. She makes sure family members understand the criminal justice process and her recommendations with respect to accepting plea offers versus going to trial so that those family members can assist her in giving client advice.

Ms. Miller found the petitioner to be immature, confused, and frustrated. The petitioner did not have a general understanding of the criminal justice process. Ms. Miller had concerns regarding the petitioner's lack of understanding and his frustration over the amount of time trial counsel spent with him prior to trial. The petitioner felt his meetings with trial counsel were insufficient to provide adequate education on the criminal justice system. According to Ms. Miller, the petitioner completely lacked knowledge of the trial process in terms of settlement offers, pleading guilty versus going to trial, and the possibility of having a bench trial in certain situations. The petitioner indicated to her that there was supposed to be a plea offer but trial counsel never followed up on it, and he did not know whether he should have or could have taken it. When Ms. Miller spoke with the petitioner, he did not understand that certain things had occurred that could not be undone. Ms. Miller believed that while the petitioner needed a lot of assistance understanding adult concepts and terms, if explained in the right way, he has the ability to understand the criminal justice process. In similar situations, she has used a psychology expert to ensure clients understand recommendations such as the benefits of accepting a plea offer versus going to trial.

Following the hearing, the post-conviction court entered a written order deciding, sua sponte, "that the petitioner should have an opportunity to clarify the proof regarding his allegation that counsel did not spend sufficient time with him before trial or give him sufficient information to enable him to make an informed choice between the plea offer and a trial." The post-conviction court then ordered the hearing be reopened and set a hearing date.

B.     Second Post-Conviction Hearing

At the subsequent hearing, trial counsel and Ms. Miller testified again. Neal Pinkston, one of the prosecutors at trial, then testified for the first time. Trial counsel testified that after reviewing his file and speaking with Mr. Pinkston, he determined the State never made a formal plea offer. He also testified that the petitioner never authorized him to make a formal proposal to the State. Furthermore, the petitioner informed him that he had spoken with his mother, and she told him not to plead guilty to anything. According to trial counsel, the petitioner was never agreeable to accepting a plea deal.

On cross-examination, trial counsel admitted that during the first hearing, he testified that he vaguely remembered speaking with the prosecutor regarding a plea offer of twenty years. After looking through his file, however, he is now clear that the prosecutor asked him to find out whether the petitioner would be willing to accept a plea deal. Trial counsel admitted to testifying incorrectly during the first hearing.

The petitioner recalled Ms. Miller as a witness. Ms. Miller testified that the petitioner and his family initially wanted to hire her to represent the petitioner in his direct appeal, but they were unable to do so. At that time, she spoke with trial counsel. Trial counsel said he was most bothered about a plea offer of twenty-five years made shortly before trial. According to Ms. Miller, trial counsel told her that he should have spoken with the petitioner in greater detail about the offer and recommended it to him.

Ms. Miller also testified that she rarely receives written plea offers, as they are typically made by telephone or in court prior to hearings. She only recalls receiving one written offer in a homicide case. She specifically asked for it in that matter so her client could sign off on his rejection of the offer.

Mr. Pinkston, the prosecutor from the petitioner's trial, testified that the State never extended a formal plea offer. Trial counsel, likewise, never proposed a potential plea, which was "in line of the past ways in dealing with [trial counsel] in regard to cases." The State had internal discussions about potentially extending an offer due to the petitioner's age, but based on the proof and the petitioner's assertion of innocence, the State declined to make a settlement offer. While Mr. Pinkston may have had casual conversations with trial counsel about potential plea offers, it was never a consistent theme in the process due to the petitioner's position that somebody else was responsible for the crime. Had the State made an offer, because of the magnitude of the case, Mr. Pinkston would have put it in writing and documented his file.

At the conclusion of the hearing, the post-conviction court reserved ruling pending a review of the transcripts. The post-conviction court subsequently entered an order

dismissing the petition for post-conviction relief. In an accompanying memorandum, the post-conviction court stated:

[I]t is clear that counsel did discuss petitioner's options with him, including a guilty plea to a lesser offense. Furthermore, the petitioner's trial testimony or counsel's post-conviction testimony reflects that the petitioner was aware of the necessity to explain his confession if he did not plead guilty. It reflects he was aware of other non-physical evidence of identity, the record of the call from the mobile phone owned by the petitioner's mother and used by the petitioner, an eyewitness's identification, and another eyewitness's description of the person following the first eyewitness as stocky, an accurate description of the petitioner but not of the other suspect, Mr. Johnson. It reflects that he was aware of the existence of physical evidence, the fingerprint, corroborating the non-physical evidence. It reflects that he was aware of the theory of the defense at trial, identity.

What is lacking, however, is evidence that counsel explored or corrected the petitioner's or the petitioner's mother's inadequate analyses of the case that, if he was not guilty, he should not plead guilty, recommend[] a guilty plea to second-degree murder, or in any way abandon[] neutrality in his presentation of the petitioner's options. This is perhaps the source of the concern that trial counsel has expressed to appellate counsel on more than one occasion. Despite the petitioner's academic achievements and the petitioner's mother's graduate degree, they did not have counsel's professional expertise in law. In view of the strong evidence of identity, the petitioner's age, and the foreseeability of the petitioner's reliance on his mother's and his own analyses, they needed more than information; they needed counsel's analysis, advice, and guidance. The Court therefore finds that counsel's performance in this respect was deficient.

Was the deficiency prejudicial? The Court finds that there is a reasonable probability that, had counsel corrected the petitioner's and the petitioner's mother's inadequate analyses of the case and recommended a guilty plea to second-degree murder, the petitioner would have allowed counsel to signal to the [S]tate's the petitioner's willingness to consider an offer and the [S]tate would have made an offer of second-degree murder.

Arguably, the frequency with which prosecutions end with a guilty plea suggests that there is also a reasonable probability that, had counsel provided more guidance, the petitioner would have followed counsel's

- 15 -

advice and accepted an offer of second-degree murder. The [P]etitioner, however, does not persuade the Court that there is a reasonable probability that he would have done so. His mother's testimony was that he rejected what she thought was an offer of twenty-five years. From his disregard of the considerable evidence that he was guilty of felony murder, his belief that he was not guilty of felony murder, and his own unrealistically favorable offer, reckless homicide, presumably with a sentence of less than or equal to four years, it appears that, before trial, his goal was to avoid or minimize incarceration. It is only now, after conviction for felony murder, that he prioritizes avoidance of a life sentence. The Court therefore finds that the deficiency in counsel's performance in this respect was not prejudicial.

The post-conviction court did not find trial counsel's performance deficient in any other respects. This timely appeal followed.

On appeal, the petitioner argues trial counsel was ineffective for failing to communicate a plea offer made by the State and failing to meet with the petitioner frequently enough to allow him to make a knowing and voluntary decision as to whether to seek a plea offer. In response, the State argues the post-conviction court properly found the State did not make a plea offer, and therefore, there was nothing to communicate to the petitioner. The State also contends the trial court properly found the petitioner was not prejudiced by any deficits in trial counsel's performance. While not directly raised as an issue by the petitioner, the State also argues the post-conviction court could, in its discretion, reopen the proof following the initial hearing for post-conviction relief.[1] Following our review of the record and submissions of the parties, we affirm the judgment of the post-conviction court.

*Analysis*

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any

---

[1] We agree it was within the post-conviction court's discretion to allow additional proof. At the time the trial court entered its order allowing the additional proof, the proceeding was not closed because the trial court had not yet ruled on the merits of the petitioner's claims. *See Donald Terry Moore v. State*, No. M2002-02417-CCA-MR3-PC, 2004 WL 1144015, at *5 (Tenn. Crim. App. May 21, 2004). "It is well settled that permitting additional proof, after a party has announced that proof is closed, is within the discretion of the trial court, and unless it appears that its action in that regard has permitted injustice, its exercise of discretion will not be disturbed on appeal." *Id.* (internal citations omitted). Neither party has shown that the presentation of additional proof in the second hearing changed the outcome of the proceeding. Based on our review of the record and submissions of the parties, the reopening of the post-conviction hearing did not cause an injustice.

right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter entrusted to the trial judge as the trier of fact. *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution require that a criminal defendant receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. Crim. App. 2004) (citation omitted). When a petitioner claims he received ineffective assistance of counsel, he has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington,* 466 U.S. 668, 687 (1984); *see State v. Taylor,* 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's

errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State,* 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland,* 466 U.S. at 688; *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn. 1975)). With regard to the standard, our Supreme Court has held:

[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

*Finch v. State*, 226 S.W.3d 307, 315-16 (Tenn. 2007) (quoting *Baxter*, 523 S.W.2d at 934-35). When reviewing trial counsel's performance, this Court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689).

To satisfy the prejudice prong of the test, the petitioner "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland,* 466 U.S. at 694). In order to prevail, the deficient performance must have been of such magnitude that the petitioner was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316.

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see also Goad,* 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

- 18 -

When a petitioner alleges he rejected a plea offer due to the ineffective assistance of counsel, he:

> has the burden to show by a reasonable probability that, but for counsel's deficient representation, (1) he . . . would have accepted the plea, (2) the prosecution would not have withdrawn the offer, and (3) the trial court would have accepted the terms of the offer, such that the penalty under its terms would have been less severe that the penalty actually imposed.

*Nesbit v. State*, 452 S.W. 3d 779, 800-01 (citing *Lafler v. Cooper*, 132 S.Ct. 1376, 1385 (2012)).

The petitioner argues he was deprived effective assistance of counsel due to trial counsel's failure to provide adequate advice regarding the benefits of accepting a plea offer and failure to convey a plea offer made on the eve of trial. According to petitioner, he endured prejudice as a result of these alleged deficiencies because he would have accepted the plea had it been adequately explained and formally offered. We disagree.

The petitioner has not met his burden of showing the allegedly deficient performance of trial counsel prejudiced the outcome of the proceeding. The post-conviction court found there was never an official plea offer of twenty or more years for second-degree murder, and based on our review, the record contains ample evidence to support this finding. The petitioner admitted he did not think the State made a formal plea offer. Ms. Bailey, the petitioner's mother, testified that she had never seen a formal written plea offer from the State. After reviewing his notes, trial counsel testified that the State never made a formal plea offer. Mr. Pinkston then confirmed the State never made a formal plea offer due to the petitioner's assertion of innocence. Without a formal plea offer, there was nothing for trial counsel to explain to his client and nothing for the petitioner to accept or reject.

Moreover, the post-conviction court found that if the plea offer had been formally conveyed to the petitioner, he would have rejected it. In reaching this conclusion, the post-conviction court noted Ms. Bailey testified that the petitioner rejected what he thought was a plea offer of twenty-five years. The post-conviction court also pointed to the fact that the petitioner, despite the considerable evidence of guilt, cared only about minimizing his sentence or avoiding incarceration altogether. According to the post-conviction court, the petitioner did not prioritize avoidance of a life sentence until after his conviction. Implicit in the findings of the post-conviction court is a determination concerning the petitioner's credibility, or lack thereof. Although the petitioner did testify that he would have accepted the plea offer if it had been formally offered to him, the

post-conviction court resolved any doubt created by this statement in favor of trial counsel.

The evidence does not preponderate against the trial court's finding that the petitioner would not have accepted a plea offer. Ms. Bailey testified that she told the petitioner not to take the offer; if he was innocent, he should go to trial and get an acquittal. Ms. Bailey further testified that trial counsel discussed an offer of twenty-five years for second degree murder with her son, and he rejected it. The petitioner confirmed that his mother told him not to take a plea. The petitioner further testified that he requested a plea of reckless homicide, a much lesser offense than second degree murder, and in response the State laughed and rejected the offer. In addition, trial counsel testified at both hearings that the petitioner made it clear he and his mother decided against the acceptance of a plea offer. The petitioner simply did not meet his burden of establishing that trial counsel's alleged error in explaining and relaying the plea offer prejudiced in deciding to go to trial. The petitioner is not entitled to relief on this issue.

Having found the petitioner did not suffer prejudice as a result of the alleged deficiencies of trial counsel, we need not address the deficiency of trial counsel's representation of the petitioner.

## *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE